IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

RICK WEISENBERGER,

        Plaintiff,

v.                                     Civil Action No. 5:04-CV-07

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
             Defendant.

## MEMORANDUM, OPINION and REPORT AND RECOMMENDATION SOCIAL SECURITY

## I. Introduction

A.    Background

    Plaintiff, Rick Weisenberger, (Claimant), filed his Complaint on January 15, 2004, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1] Commissioner filed her Answer on June 8, 2004.[2] On January 28, 2005 the undersigned issued a Report and Recommendation to dismiss this action for Claimant's failure to file a timely brief.[3] Claimant filed his Motion for Summary Judgment on February 1, 2005.[4] Commissioner filed her Motion for Summary Judgment on March 3, 2005.[5] Claimant filed his Reply Brief in support of his Motion for Summary Judgment on March 7, 2005.[6]

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 6.

[4] Docket No. 7.

[5] Docket No. 8.

[6] Docket No. 9.

B.    The Pleadings

      1.    Claimant's Motion for Summary Judgment.[7]

      2.    Commissioner's Motion for Summary Judgment.[8]

      3.    Claimant's Reply Brief in Support of his Motion for Summary Judgment.[9]

C.    Recommendation

      1.    I recommend that Claimant's Motion for Summary Judgment be DENIED because the ALJ was substantially justified in his decision.  Specifically, the ALJ properly evaluated the opinions of Claimant's treating psychiatrist and psychologist and properly evaluated Claimant's credibility.

      2.    I recommend that Commissioner's Motion for Summary Judgment be GRANTED for the same reasons set forth above.

## II.  Facts

A.    Procedural History

On June 7, 1994 Claimant filed for Disability Insurance Benefits (DIB) alleging disability since January 13, 1993.  Claimant amended his claim to seek a closed period of disability from January 13, 1995 through November 15, 1995.  On February 22, 1996 an ALJ found Claimant disabled during the closed period of disability.

On September 12, 1997 claimant filed his second application for DIB alleging disability since February 1, 1996.  The claim was ultimately denied.

---

[7] Docket No. 7.

[8] Docket No. 8.

[9] Docket No. 9.

On August 4, 2000 Claimant filed his third claim for DIB and Supplemental Security Income (SSI) alleging disability since August 1, 1999. The application was denied initially and on reconsideration. A hearing was held on January 10, 2002 and on November 26, 2002 before an Administrative Law Judge (ALJ). The ALJ's decision dated November 28, 2002 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on November 12, 2003. This action was filed and proceeded as set forth above.

B.    Personal History

Claimant was 39 years old on the date of the November 21, 2002 hearing before the ALJ. Claimant has the equivalent of a high school education and past relevant work experience as a printing press operator and as a rewinder operator in a paper mill.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability August 1, 1999 - November 28, 2003:

1.  Medical Records

**Dr. Vicky Moody, D.O., Psychiatrist**
Tr. p. 144, April 22, 2000
•       Diagnosis: Major depression recurrent in remission. Rule out dysthymic disorder. History of chronic back pain secondary to an injury. Will continue Effexor XR 75 mg daily.

**Dr. Vicky Moody, D.O., Psychiatrist**
Tr. p. 145, January 27, 2000
•       Patient states that when he takes his medication regularly, his mood is quite good. Patient is sleeping well, his appetite is good. He states that he has no side effects to the medication. Patient continues to have a lot of difficulty with pain in his back, but evidently, he has been able to deal with that better since his depression has subsided.
•       Diagnosis: Major depression recurrent in remission. Rule out dysthymic disorder. History of chronic back pain secondary to injury. Continue Effexor XR 75 mg daily.

**Dr. Vicky Moody, D.O., Psychiatrist**
Tr. p. 146, November 22, 1999
- Patient states he notices improvement in his mood since he started taking Effexor. He was able to take some short walks, helps with the very light housekeeping chores. Patient states that his sleeping has improved from 2-3 hours a night to 6 hours. Appetite seems to stabilize.
- Diagnosis: Major depression recurrent with mild to moderate symptoms. Rule out dysthymic disorder. History of chronic back pain secondary to injuries. Continue Effexor XR 75 mg daily for the time being.

**Dr. Vicky Moody, D.O., Psychiatrist**
Tr., pp. 147-149, November 1, 1999
- Patient is a 45 year old married white male who is seen today for psychiatric evaluation.
- History: Patient indicated he has had some depression off and on, particularly in the past five years which resurfaced around the time he was going through a divorce. Patient admits that at the time, he was drinking rather heavily. Once patient got remarried, things started to settle down until January 13, 1993 when patient suffered a back injury while at work and has not been working since that time. Patient used to be a fairly active person and since the injury, his lifestyle has changed rather significantly.
- Past medical history: Patient sustained a ruptured disc in 1991 and had surgery for that in 1992. He reinjured his back in January of 1993 and underwent another surgery. He is currently disabled because of it.
- Current medications: Parafon, Forte, and Ultram for his back. Patient currently smokes 2-1/2 packs of cigarettes per day and has smoked for about ten years. Patient states that during the time of his divorce, he was consuming about two cases of beer per day and continued that pattern for about a year. Patient received a D.U.I. during that time. Currently, patient drinks three beers or less per month. Patient stated that he has smoked pot three times in his life and denied use of any other drugs.
- Diagnosis: Major depression recurrent with mild to moderate symptoms. Rule out dythymic disorder. History of chronic back pain secondary to injuries. Current GAF: 62.

**Constance L. Kuhn, M.S., LPCC, LSW, Clinical Team Leader**
Tr., pp. 156-158, September 3, 1999, Case Record
- Diagnostic Assessment: 45 year old male, married two times who has one daughter. States that he is experiencing a lot of sadness and loneliness.
- Development History: Patient reports that at the age of two, he had a head injury and was in a coma for ten days. Patient was in counseling while in Indiana for depression. He was prescribed Zoloft but quit taking it because it was too expensive. Client states that he drank a lot of alcohol around his divorce for about two years. He reported that he never used illegal drugs and that he now occasionally drinks alcohol.
- Diagnostic Impression: Patient experienced a lot of losses to include his health, his daughter, his family of origin and employment. He has been experiencing depression for about three years or more.

4

- Diagnosis: Major depression, recurrent moderate. Backaches, hearing problems, financial problems, unemployment, family problems.

**Wheeling Health Right, Inc.**
Tr. pp. 160-164
- Progress Notes: Illegible.

**George E. Bontos, M.D., Family Practice**
Tr. pp. 165-171, October 12, 2000
Patient has constant daily pain which is disabling. He cannot be gainfully employed. Pain in spine radiates down below knees, depression and anxiety. Pain in legs causes limping.
- Psychiatric Review Technique

**Frank D. Roman, Clinical Psychologist**
Tr. pp.173-186, October 17, 2000
- Medical Disposition: Impairments are not severe.
- Category Upon Which Medical Disposition is Based: 12.04 affective disorders. Notes are illegible.

**Charles Paroda, D.O.**
Tr. pp. 188-193, November 29, 2000
Patient is a 47 year old male whose height is 5' 8" and he weighs 263 pounds.
- Chief Complaint: Back pain, knee pain, and depression.
- Medications: Zyrtec, Effexor, Daypro, Ultram.
- Physical Examination: Patient ambulates with a normal gait and does not require the use of ambulatory aid. The patient is comfortable at standing, sitting and supine positions. Patient's mental state appears to be normal and the intellectual functioning is normal. Spinal curvature is normal, palpitation and percussion of the cervical spinous processes revealed no tenderness. Palpation of the paracervical muscles reveals no tenderness, swelling or redness. The cervical spine shows normal range of motion without any restrictions. Patient had a scar in the lower lumbar area. He had tenderness over the scar with palpation. There was no redness, swelling or spasms of the musculature. He did straight leg lifts bilaterally to 90 degrees with some lower back discomfort. He flexed forward to 40 degrees, extended to 20 degree, and side bend to 30 degrees with some lower back pain. Neurologically, the patient is grossly intact without any focal deficits. Crainal nerves 2 through 7 are grossly intact. Sensory is intact, motor strength is equally bilateral in both upper and lower extremities. Grip strengths were at 38, 36 and 36 kgf on the right, and 38, 42 and 42 KGF on the left. There is no evidence of any muscle atrophy or wasting. Deep tendon reflexes are equal bilaterally in both upper and lower extremities and are graded + 1/4. Patient was able to stand on his heels, toes, walk in heel to toe tandum and stand up on one leg without difficulty. He did a partial squat where he complained of his knees hurting him. Patient is able to write his own name, pick up coins and perform fine, manipulative testing.
- Impressions: Obesity, chronic and acute low back pain, post laminectomy syndrome, bilateral knee pain, rule out arthritis.
- Summary: Patient's obesity probably contributes to his lower back pain,

especially with his flexion and he may also have an abdominal back syndrome in addition to the post laminectomy syndrome. Patient complained that his knees hurt him, but they were completely normal and stable. He may have some mild arthritis, but nothing appears to be debilitating. No evidence of any radiculopathies.

**Eli Rubenstein, M.D.**
Tr. p. 194, November 29, 2000
       There is screw fixation between L4 and L5 and L5-S1. The rest of the interspaces are normal. The sacroiliac joints are normal.
       •     Impression: Metallic fixation between L, 4L, 5, and L5-S1.

**Northwood Health Systems**
Tr. p. 197-202, June 20, 2003
**Ronald L. Rielly, Licensed Psychologist**
       •     Clinical Interview and Psychological Testing: The MCMIII was administered and yielded a valid profile. Patient responded to test items in matters adjusting a normal level of openness. Test results indicate the probable presence of at least one moderate clinical symptom disorder and one or more personality disorders. Individuals with this MCMII profile are phobic avoidants.
       •     Diagnostic Impression: Major depression recurrent moderate. Back pain: GAF of 50. It is likely that patient will benefit from continued involvement in level 2 services, individual therapy, and psychiatric services to address dysphoric features. Cognitive behavioral therapy will likely provide the best modality for psychotherapeutic treatment. At some point in time, Referral Pain Management Programming may also prove to be beneficial.

**Rafael G. Semidei, M.D.**
Tr. pp. 203-205, Northwood Health Systems, Psychiatric Evaluation
       •     Mental Status Examination: Patient is alert, oriented (x4). He is pleasant, cooperative, and appropriate. There is no evidence of flight of ideas or loosening of associations. Affect is blunted. Mood is mediocre. No evidence of overt psychosis. Attention and concentration appear intact. He is able to remember 3 out of 3 objects initially, but only 1 out of 3 objects after 5 minutes.
       •     Impression: Mood disorder, secondary to medical condition, pain disorder with associated medical and psychological factors.
       •     Status: Post laminectomy (x2). Chronic low back pain. GAF of 50 with significant impairment in social and occupational functioning.

**Northwood Health Systems**
Tr. pp. 206-209, December 11, 2000
       •     Impression: Major depressive disorder 296.32, back disorder 724, jf 48.

**Northwood Health Systems**
Tr. pp. 211, Standard Progress Note, May 15, 2001
       •     Impression: Major Depressive Disorder by history.

**Northwood Health Systems**
Tr. pp. 212, April 20, 2001, Therapy Progress Note
• Patient actually participated in therapy session. Patient is taking medication as directed.

**Northwood Health Systems**
Tr. p. 213, April 13, 2001, Therapy Progress Note
• Getting outdoors has helped the patient's mood.

**Northwood Health Systems**
Tr. p. 213, April 6, 2001, Therapy Progress Note
• Patient listens to music and said that therapy has helped him open up and talk about himself.

**Northwood Health Systems**
Tr. p. 215, March 30, 2001, Therapy Progress Note
• Patient is worried about his finances and his taking medications as directed.

**Northwood Health Systems**
Tr. p. 216, March 16, 2001, Therapy Progress Note
• Patient reports not sleeping well due to back pain and lots of things on his mind.

**Northwood Health Systems**
Tr. p. 217, Therapy Progress Note, March 9, 2001
• Patient reports being awake most of the week due to trouble sleeping.

**Northwood Health Systems**
Tr. p. 218, March 2, 2001, Therapy Progress Note
• Patient reports no social contacts with others due to his wife's illness.

**Northwood Health Systems**
Tr. p. 219, February 20, 2001, Therapy Progress Note
• Patient's mood has been kind of up and down.

**Northwood Health Systems**
Tr. p. 220, February 16, 2001, Therapy Progress Note
• Patient reports erratic sleep patterns.

**Northwood Health Systems**
Tr. p. 221, February 9, 2001, Therapy Progress Note
• Although it is difficult, patient is trying to keep a positive outlook.

**Northwood Health Systems**
Tr. P. 222, February 2, 2001, Therapy Progress Note
• Patient continues to have a lot of worries about finances and family.

**Northwood Health Systems**
Tr. p. 223, January 26, 2001, Therapy Progress Note
• Patient reports a lot of worry about finances and family.

**Northwood Health Systems**
Tr. p. 224, January 11, 2001, Therapy Progress Note
• Patient reports a lot of physical discomfort due to back pain. He says the medicine is not doing much for him.

Tr. p. 225, January 5, 2001, Therapy Progress Note
• Patient reports mood is down and he has little desire to do anything. Patient reports that he has not used alcohol in almost a month.

Tr. p. 226, December 28, 2000, Therapy Progress Note
Patient wants to continue working on feeling better about himself.

Tr. p. 227, December 18, 2000, Therapy Progress Note
• First Visit: Patient reports a past history of treatments since 1993 for depression. Reports a past history of alcohol abuse, but now says he seldom drinks and he doesn't see it as a problem.

**Dale L. Simmons, Family Practice**
Physical Residual Functional Capacity Assessment, Tr. pp. 228-235, September 11, 2001
• Illegible.

Psychiatric Review Technique Form, September 7, 2001, Samuel W. Goots, Tr. pp. 237-250
• Impairments not severe. Category upon which disposition is based 12.04 affective
disorders. Mild restriction of activities of daily living. Mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, no repeated episodes of decompensation each of extended duration.

**Wladimira Zyznewski, M.D.**
Tr. p. 252, July 11, 2001
• Nerve Conduction Velocities for the median and ulnar nerves bilaterally were normal, ranging between 40 and 48 meters per second with normal amplitudes. The distal motor latencies for the medial nerves bilaterally were prolonged, measuring 5.5 meters per second. Amplitudes were unremarkable. The distal motor latencies for the ulnar nerves bilaterally were unremarkable, ranging between 2.9 and 3 meters per second normal amplitudes. The F-waves for the median and the ulnar nerves bilaterally were normal, ranging between 30 and 31 meters per second. Amplitudes were 200 microvolts. The distal sensory latencies for the median nerve on the right side measured 5.5 meters per second; on the left side 4.6 meters per second; amplitudes 10 microvolts. The distal sensory latencies for the ulnar and radial nerves bilaterally

were unremarkable, ranging between 2.8 and 3.1 meters per second.  Amplitudes normal.
Needle study of both upper extremities were performed.  The abductor pollicis brevis first dorsal
interosseous flexer carpi radialis biceps and triceps muscles were studied and were normal with
normal insertion.  Needle activity motor unit potentials.
•        Impression: Bilateral median neuropathy moderate in nature.
Electrophysiologically (bilateral carpal tunnel syndrome): No evidence of radiculopathy
detected.

**Northwood Health Systems, Psychological Evaluation, Michael J. Marshall, Ph.D.**
Tr. pp. 253-258, October 3, 2001
•        Luria Nebraska Neuropsychological Screen: Patient's score of 3 is within normal limits.
The Million Clinical Multiaxial Inventory Three Test was administered.  Conclusions are patient
suffers from depression which appears to be an exacerbation of a previous condition.  Much of
that exacerbation is likely related to the patient's physical condition over the last several years.
A personality disorder was added to his diagnosis based upon three sources of information, the
MCMI 3 results, a clinical interview, and collateral information from his therapist.  All three
sources of information are strongly consistent with Avoidant Personality Disorder.
•        Impression: 296.32 major depression recurrent moderate.  301.82 Avoidant Personality
Disorder with Dependent Traits.  7/24 back pain. Psychological and environmental problems 04
occupational and a GAF of 50.

**Dr. Wladamir Zyznewsky**
Tr. pp. 259-268, July 26, 2001
•        Patient comes back for follow up.  He has improved some but still has pain.  Will
increase the Neurontin 600 mg to q.i.d.  His EMG's were compatible with carpal tunnel
syndrome.  He is wearing wrist splints.

August 23, 2002
•        Patient has made a remarkable improvement.  Reports the pain is down to 3 on a
scale of 1-10, 10 being severe.  He is happy with Neurontin 600 mg q.i.d.  No side effects.  He is
trying to use Darvocet and Ibuprofen less frequently.

December 20, 2001
•        Patient reports having been in a motor vehicle accident about a week or two ago. He has
been having increasing back pain and also suffers from carpal tunnel syndrome, but he is not
interested in having surgery done.  In view of his back pain increasing, I will schedule him for a
follow up C T Scan.  His exam, otherwise, basically remains the same.  I don't see any
weakness.  He is able to walk.  Reflexes were symmetric.  He takes Neurontin 600 mg q.i.d and
reports that it had been helpful.

May 15, 2001
•        Patient reports of chronic back pain.  I started him on Neurontin 300 mg t.i.d.
Patient has history of back fusion.  C T Report is compatible with this.

<u>June 16, 2001</u>
• Patient believes he had improved some on Neurontin 300 mg bid, perhaps 20 to 30 percent in terms of pain. I will increase his medication to 600 mg t.i.d.

<u>December 28, 2001</u>
• No change in the position and alignment of metallic spacers within the L4-5 and the L5-S1 intervertebral disc spaces.

<u>July 11, 2001</u>
• Bilateral median neuropathy. Moderate in nature, electropathysiologically. No evidence of radiculopathy detected.

<u>April 25, 2001</u>
• Bilateral symmetric peripheral neuropathy. Moderate in nature, electrophysiologically.

<u>March 6, 2001</u>
• Patient has had anterior lumbar fusion at L4-5 and L5-S1 with a metallic cage and the disc spaces at these levels. The lumbar vertebrae are of normal height and alignment. The other intervertebral disc spaces are well maintained. No malalignments are seen on neutral extension or flexion views.

<u>March 1, 2001</u>
• There are six non-rib containing lumbar vertebral bodies. There is body fusion at the L5-6 and L6-S1 levels with metallic fusion cages. The patient has had previous posterior laminectomies at the L5-6 and L6-S1 levels.

**Northwood Health Systems**
<u>Therapy Progress Note, Tr. p. 269, February 14, 2002</u>
• Patient's sleeping is poor.

**Northwood Health Systems**, <u>Tr. p. 270, January 17, 2002, Therapy Progress Note</u>
• Patient's wife may have lung cancer and he is having a tough time dealing with it.

**Northwood Health Systems**, <u>Tr. p. 271, January 15, 2002, TCM Progress Note, Face-to-Face</u>
• Diagnosis: Major depression, impulse control disorder.
• Medication: Zyprexa, Effexor. No side effects are reported or observed. Mood and affect
subdued. Speech is goal oriented, focused, of regular rate and rhythm. Reports that the Zyprexa has helped with his feelings of anger and poor impulse control. He said he could feel a major difference and thought things were going really well. He and his wife then received devastating news that she has cancer of the lung and this has been very stressful for them as a family. Reports that prior to this, he was sleeping and able to relax more. That he was feeling calm on

some days which was seen an improvement from feeling angry all of the time. Continue present medication regime.

**Northwood Health Systems**
<u>Tr. p. 272, December 27, 2001, Therapy Progress Note</u>
- Patient reports that sleeping is poor.

<u>Tr. p. 273, December 20, 2001, Therapy Progress Note</u>
- Patient had a rear-end accident on Interstate 70. Since the last visit, he reports being in a lot of pain. Xyprexia has been increased to 10 mg this week. He has not noticed any change yet.

**Northwood Health Systems**
<u>Tr. p. 274, December 18, 2001, TCM Progress Note Assessment Face-to-Face</u>
- Diagnosis: Depression of personality disorder. Back pain syndrome.
- Medication: Effexor and Zyprexa from NHS. Family doctor prescribes Neurontin, Ibuprofen, Zyrtec. Mood and affect are subdued. Speech is of slow pattern. Goal oriented focused. Reports that if he could change one thing about how he felt, he would want to feel less depressed and moody all of the time. Reports that he is in constant pain and very frustrated about not being able to have the energy to do things that he used to do. Before his back pain began, he was out all the time riding four wheelers, hunting and fishing. He now spends his time watching television.

<u>Tr. p. 275, November 29, 2001, Therapy Progress Note</u>
- Patient reports sleeping is sporadic.

**Northwood Health Systems**
<u>Tr. pp. 276-278, Therapy Progress Notes, November 27, 2001-November 8, 2001</u>
- Patient says he is at a point where he hates to be around people. Patient reports that sleeping is sporadic.

**Northwood Health Systems**
<u>Tr. pp. 279-282, Therapy Progress Notes, October 1, 2001-October 18, 2001</u>
- Patient is still not sleeping well. He describes his mood as down. Reports no social contact with others. Patient is trying to find a way to get out of the city and into the country.
- Impression: Major depression recurrent mild, nicotine dependence, chronic back pain, GAF: 60.

**Northwood Health Systems**
<u>Tr. pp. 283-286, Therapy Progress Notes, September 4, 2001-September 27, 2001</u>
- Patient is still not sleeping well. Reports no increase in socializing. In light of what's going on in the country today, patient has a fear of being invaded.
- Impression: Major depressive disorder recurrent by history.

**Northwood Health Systems**

<u>Tr. pp. 287-291, Therapy Progress Notes</u>
- Patient is worried about his wife's health and is still not sleeping well. He is trying to keep a positive attitude. No increase in socializing.

**Northwood Health Systems**
<u>Tr. pp. 292-296, Therapy Progress Notes</u>
- Current Medication: Motrin 800 mg t.i.d., Darvocet N 101 tablet t.i.d., Neurontin 300 mg qid, Zyrtec 10 mg q day, and Effexor 100 mg bid.
- Major depressive disorder recurrent in partial remission, chronic lower back pain. Patient is not sleeping well. Patient wore both wrist braces due to carpal tunnel syndrome. Continues to have limited social contact with others.

**Northwood Health Systems**
<u>Tr. pp. 297-300, June 7, 2001-June 21, 2001</u>
- Patient continues to have problems with change. Patient not sleeping well.

**Northwood Health Systems**
<u>Tr. p. 302, Therapy Progress Note, May 24, 2001</u>
- Patient's mood has been up and down.

**The Schiffler Cancer Center**
<u>Tr. pp. 327-333, August 23, 2002, Letter from Dr. Pollock, M.D., Ph.D. to Dr. Parenteau, M.D.</u>
- Patient completed his Neoadjuvant or definitive course of chemo radiotherapy for a locally advanced distal esophageal adenocarcinoma.

<u>Tr. p. 348, Wheeling Hospital Physician Attestation Report, April 26, 2002</u>
- Diagnosis: 415.19 pul embolism insarct 578.0 hematemesis 4l0.71 AMI subendocard Infarct Initl 285.1 AC posthemorrhag Anemia 453.8 venous thrombosis NEC.

<u>Tr. p. 349, Wheeling Hospital Inpatient Admission Record, April 16, 2002</u>
- Acute anemia due to gastrointestinal bleeding. Acute myocardial infarction, pulmonary embolism, deep venous thrombosis, depression by history, arthritis, S/P herniated disc lumbar spine, S/P low back surgery infusion.

<u>Tr. p. 363, Wheeling Hospital, April 16, 2002</u>
- Frontal and lateral views show mild cardiomegaly with clear lungs. No acute infiltrate or change since April 10, 2002.

<u>Tr. p. 365, Wheeling Hospital</u>
- Patient was scheduled for a barium enema. There is residual barium throughout the colon extending to the rectum. The patient needs to have a bowel prep prior to performance of the barium enema. There is an interior vena cava filter in place. There are metallic devices in the intervertebral disc spaces in the lower lumbar spine from previous disc fusion.

Tr. p. 367, Wheeling Hospital
• Suboptimal air contract barium enema secondary to residual fecal material. The fecal material is most marked in the transverse colon. There is no evidence of large obstructing mass or stricture.

Tr. p. 368, Wheeling Hospital, April 10, 2002
• Fluoroscopy.
Tr. p. 369, Wheeling Hospital, April l0, 2002
• No acute infiltrate or change since April 7, 2002. Frontal and lateral views again show mild cardiomegaly with clear lungs.

Tr. p. 371, Wheeling Hospital, April 10, 2002
• Subsegmental defect to both lungs. Probability of P.E. increased.

Tr. p. 372, Wheeling Hospital, April 8, 2002
• There is a 2 cm solitary gallstone. The common bile duct measures up to 4 ml in diameter. There is suboptimal evaluation of the pancreas and liver for reasons described above.

Tr. p. 374, Wheeling Hospital, April 7, 2002
• Cardiomegaly without acute infiltrate.

**Robert J. Fanning, D.O.**
Tr. p. 376-377, Wheeling Hospital, April 10, 2002
• Normal left ventricular systolic function. Dilated right ventricle with multiple doppler indicates consistent pulmonary hypertension.

**John D. Holloway, M.D.**
Tr. p. 378, Wheeling Hospital, April 9, 2002
• The study demonstrates a thrombosed posterior tibial vein in the right distal calf. The mid and proximal calf veins could not be visualized. All veins proximal to both calves showed no evidence of a deep venous thrombosis.

Tr. pp. 381-382, Wheeling Hospital, February 27, 2002
• Discharge Summary: Final diagnosis: Pneumonia, hypoxemia, iron deficiency anemia, arthritis of the spine, depression by history, status post-herniated disc L4/5 in 1994, extreme obesity. 48 year old white male obese, admitted through emergency room because of shortness of breath.
• Discharge Instructions: Diet: 1,000 calorie reducing diet. Activity: ad lib. Zithromax 500 mg daily for five (5) days more; Niferex 100 mg daily after lunch; Neurontin 600 mg t.i.d. as before; Effexor XR 150 mg b.i.d.; Zyprexa 5 mg daily at bedtime; Zyrtec 10 mg daily for allergic rhinitis; Motrin 800 mg t.i.d. after meals for arthritis.

Tr. pp. 383-384, Wheeling Hospital, February 22, 2002
• History and Physical Examination: Chief Complaint: Shortness of breath, cough,

13

fever, chills and weakness.
- • Impression: Pneumonia and hypoxia.

Tr. p. 391, Wheeling Hospital, February 22, 2002
- • Left lung infiltrate.

Tr. pp. 394-396, Wheeling Hospital Pathology Department, Surgical Report
- • The frozen section slide shows no metastatic carcinoma but the permanent sections show metastatic tumor, probably due to the deeper cut of the edge of the node. The frozen section slide shows suspicious tumor cells, but the permanent section did not. Gastric fundus, EEA Anastomosis Site.

Tr. pp. 397-399, Wheeling Hospital Pathology Department, Amended Pathology Report
- • The frozen section slide shows no metastatic carcinoma but the permanent sections show metastatic tumor, probably due to the deeper cut of the edge of the node.

**Wheeling Hospital**, Admittance Report,, 4/7/2002, Tr. 352-354
A. V. Jellen, M.D.
- • Chief Complaint: The patient stated that his blood pressure level dropped and felt weak. He may also have passed out.
- • History of Present Illness: The patient is a 48 year old male who has a known history of gastroesophageal reflux disease. He has a history of anemia, felt to be secondary to an iron deficiency.
- • Impression: Chest discomfort, dyspnea and weakness–rule out myocardial infarction. Hypotension with near syncopal episode. Anemia.
- • Plan of Treatment: Admit to IMU, bed rest, routine coronary care, serial enzymes, electrocardiogram, Pepcid IV.

Discharge Summary, 4/16/2002, Tr. 350-351
Hossein Yassini, M.D.,
- • Hospital Course: The patient, on admission, was in the Intensive Care Unit. His blood pressure was dropped and later became stable, the patient had severe anemia. The patient had thrombophlebitis of the leg and we consulted with Dr. David Ghaphery who placed a filter in the patient's inferior vena cava to prevent any further pulmonary embolism. After a few days the patient's condition improved and he was then moved from the ICU to the IMU.
- • Discharge Diagnosis: Pulmonary embolism, hematemesis, post hemorrhagic anemia, subendocardial infarction, and venous thrombosis.

Radiology Consultation, 4/26/2002, Tr. 319
Hossein Yassini, M.D.,
- • Chief Complaint: Questionable GI bleeding and anemia.
- • Examination: Barium enema.
- • Findings: There is adequate coating and distention of the entire colon. There is no

evidence of persistent mass or stricture.
- Impression: The Air Contrast Barium Enema was within normal limits.

Outpatient Surgery, 5/20/2002, Tr. 343-347
David Bowman, M.D.,
- Chief Complaint: Difficulty swallowing.
- History of Present Illness: The patient has previously been treated for gastroesophageal reflux.
- Findings: A mass was found on the patient's esophagus.
- Cytologic Diagnosis: Adenocarcinoma.
- Pathologic Diagnosis: Moderately differentiated adenocarcinoma.

Emergency Room, 6/6/2002, Tr. 335-342
Matthew Fox, M.D.,
- Chief Complaint: GI bleeding.
- History of Present Illness: The patient has esophageal cancer.
- Impression: The patient was without symptoms when he arrived.
- Plan of Treatment: The patient was advised to rest at home and watch for any further symptoms.

Schiffler Cancer Center, 7/10/2002, Tr. 324-326
Jondavid Pollock, M.D., Ph.D.,
- Chief Complaint: Esophageal cancer.
- Impression: The patient is a 48 year old man with what appears to be a local only distal esophageal adenocarcinoma.
- Plan of Treatment: Various treatment options, pending the completion of a staging evaluation, include surgery alone, chemoradiotherapy, or trimodality chemoradiotherapy followed by restaging and consideration of a completion esophagogastrectomy. It is my feeling that patients with a good performance status will do best with aggressive trimodality chemoradiotherapy followed by completion esophagogastrectomy.

Radiology Consultation, 7/11/2002, Tr. 317-318
Gary Parenteau, M.D.,
- Examination: CT scan of chest and abdomen.
- Findings: The patient's lungs and mediastinal windows were photographed. The lungs are clear. There is a soft tissue mass involving the distal esophagus. The soft tissue mass extends into the fundus of the stomach. There are adjacent enlarged lymph nodes.
- Discharge Diagnosis: The finding is compatible with the patient's known esophageal cancer.

Admittance Report, 7/15/2002, Tr. 309-316
Thomas Przybysz, M.D.,
- Chief Complaint: The patient was admitted for a course of chemo and radiation therapy.
- History of Present Illness: The patient is a 48-year-old male who in April developed

shortness of breath. He was found to be anemic and a subsequent work-up demonstrated an esophageal mass at 38 cm. This had the classic appearance of carcinoma. A biopsy was obtained which revealed a moderately differentiated adenocarcinoma.

Discharge Summary, 7/19/2002, Tr. 309-316
Thomas Przybysz, M.D.,
- Hospital Course: Cisplatin 170 mg was administered to the Patient on the first day. 5-FU 2100 mg IV was administered to the patient on days one through four.
- Discharge Diagnosis: Chemotherapy maintenance and esophageal carcinoma.

Admittance Report, 8/12/2002, Tr. 303-308
Thomas Przybysz, M.D.,
- Chief Complaint: The patient was admitted for a second course of chemo and radiation therapy.
- History of Present Illness: The patient is a 48-year-old male who in April developed shortness of breath. He was found to be anemic and a subsequent work-up demonstrated an esophageal mass at 38 cm. This had the classic appearance of carcinoma. A biopsy was obtained which revealed a moderately differentiated adenocarcinoma. The patient received his first course of chemotherapy one month ago.

Discharge Summary, 8/16/2002, Tr. 303-308
Thomas Przybysz, M.D.,
- Hospital Course: On the first day the patient was administered 165 mg of Cis-platinum. 5-FU 2100 mg IV was also administered to the patient on days one through four.
- Impression: The patient tolerated the treatment well overall. He will be discharged and will resume normal activities and diet as tolerated.
- Discharge Diagnosis: Chemotherapy maintenance for esophageal carcinoma.

Vascular Consultation, 8/20/2002, Tr. 323
John Holloway, M.D.,
- Chief Complaint: The patient presents with an inflamed thrombosed vein on his left leg.
- History of Present Illness: The patient has an inferior vena cava filter following a deep venous thrombosis in April.
- Examination: A lower extremity venous study was performed.
- Findings: Only the left lower extremity was examined. Venous imaging was performed for the left common femoral, superficial femoral, popliteal, peroneal, and posterior tibial veins. All veins were normal. The left greater saphenous vein was not compressible from the level of mid calf up to its origin at the saphenofemoral junction.
- Impression: Based on this study there is no evidence of acute deep venous thrombosis anywhere in the left lower extremity. Examination of the right common femoral and proximal mid superficial femoral veins was normal which suggests there is no venous obstruction involving the right lower extremity.

Vascular Consultation, 8/28/2002, Tr. 322

John Holloway, M.D.,
- Chief Complaint: Possible deep venous thrombosis of both lower extremities.
- History of Present Illness: The patient has an inferior vena cava filter following a deep venous thrombosis in April.
- Findings: The Doppler signal in the deep veins of both lower extremities was normal. Venous imaging was performed on both common femoral, superficial femoral, popliteal, peroneal and posterior tibial veins. All veins were compressible. The left greater saphenous is non-compressible from the proximal thigh to the saphenofemoral junction.
- Impression: Based on this study there is no evidence of acute deep venous thrombosis in wither lower extremity.

D.   Testimonial Evidence

1. Claimant

Testimony was taken at the hearing dated January 10, 2002 from Claimant, who testified as follows (Tr.419-21, 424-26, 429–32):

Q      Okay.  Now, you indicate that you became disabled back in August of '99. What's been going on since then?

A      I've been going through some - - a lot of depression, as well as a lot of back pain. Stumbling and falling and things of that nature.  Carpal tunnel showed up in my wrist where I got constant pains in my hands and wrists.

Q      But that's a recent thing, isn't it?

A      The carpal tunnel, yes.

Q      Yeah.

A      That was found about six months ago.

Q      Okay.  Now what's the main reason you think you wouldn't be able to do a full day of work?

A      Because of the depression I really don't have a desire to do much of anything.

Q      How do you spend most of your time?

A       Sitting around the house taking, taking it easy, watching TV.  Getting some pain, and then I'll lay down.

Q       Now when you're watching TV, do you pretty much understand everything you're watching?

A       Lots of times, no, I just sit there and have it for the noise.

Q       Do you help out with any chores, or anything, around the house?

A       I'm not able to do very much, no.

Q       Do you help out with anything?

A       Occasionally, I'll wash a dish or two, but, no, I can't do it for five minutes at a time, you know, and I'm in some pain and I've got to quit.  Basically, my wife takes care of most of the household chores.

Q       How would you rate your pain on a scale of one to 10 on an average day?

A       Most days it will run somewhere's between a three and a six.

Q       And how - - what's - - well, that's a fairly light range.  What's the average?

A       The average would probably be about a five pain level.  Somewhere's in the middle.

Q       And then does anything, things make it worse?

A       Yes.  Sitting in one position for too long, or sit down for too long, standing up for too long.  Even walking sometimes makes it worse as far as pain levels.

Q       Where is the pain located?

A       Lower back.

Q       Does it move around?

A      I do have radiating pain, usually down the legs.

Q      Both legs?

A      Both legs, predominately in the right side.  There have been times when the pain has been so intense that I've actually stumbled and fell from, from the pain.

Q      How often does that happen?

A      Well, it varies to put it on how much I walk.

Q      Now when the pain gets worse than a five out of 10, what's the highest it gets to?

A      Probably about an eight.

Q      And what's the best it gets?

A      The best that its ever got would probably be a three.

Q      Okay.  Anything make it better?

A      I'm not found anything at all really that, that really consistently makes it better.

*          *          *

Q      Okay.  Now you said you've had the carpal tunnel for about six to eight months.  And how do you deal with that?  I mean what, what kind of problems does it cause?

A      It causes me not to be able to pick things up, to hang onto things.  You know, I'll drop things.

Q      Can you use a knife and fork okay?

A      There are times when I have a hard time doing that.  I'll actually, you know, if I'm hanging onto a fork, trying to eat, I'll actually drop it.

Q      How often does that happen?

A      Maybe once or twice a week.  Depend on, you know, how many times I eat, most

of the time I only eat once a day.

Q       And have you lost weight over the last couple years?

A       My weight has fluctuated up and down.

Q       Okay.

A       I've lost some and then I've gained some, then I've lost some, gained some.

Q       And what's the net effect?

A       Probably 30, 40 pounds.

Q       Which way?

A       Both directions.  I'll go up, then I'll go down, I'll go down, go up.

Q       Okay.  So even though you only eat one meal a day, you put on 30 pounds?  You have to say yes or no.

A       Yes.

Q       Okay.  Now, what other problems does the carpal tunnel cause you, do you have pain with it?

A       Oh, yes.

Q       When is the pain?

A       Where is the pain?

Q       When?

A       When is the pain?

Q       Yeah.

A       When I don't have braces on, when I'm bending my hands.  If I keep my wrist in, in a bent position for any period of time.  If, if I'm out in the cold.

*           *           *

Q       I'm just jumping around here to cover a few things.  Yeah, not to get overly
focused on, but how much do you weigh today, again?

A       Roughly, 260.

Q       All right.  Now is that the most you've weighed or have you weighed more than
that?

A       That's the most I've ever weighed.

Q       Compared to how much maybe a year ago?

A       A year ago I was probably about 235.

                    *           *           *

A       They're less often, yes.

Q       All right.  How is your sleep?

A       It's still very sporadic.

Q       Do you have trouble falling asleep or staying asleep or both?

A       Both.

Q       Roughly speaking, what time do you go to bed at night?  Ordinarily?

A       Around 9:00.

Q       And forget what happens in the middle for a minute, what time do you tend to get
out of bed in the morning for the day?

A       Probably about 7:30, 8:00.

Q       So you're in bed 10 or 11 hours.  How many of those hours would you say you
sleep during the night?

A        Probably three to four.

Q        Altogether?

A        Altogether.

Q        And when you get up in the morning, are you rested from that much sleep?

A        No.

Q        Do you get a second wind or do you stay tired during the day?

A        I stay tired pretty much all the time.

Q        A little bit different from fatigue would be, or energy, well, energy, would be motivation, you know, the desire, the will to do things.  Have you noticed any problems with that?

A        I really don't have much of a desire, or will, to do anything.

Q        Now, there's depression and there's depression, if you know what I mean.  Some people, you know, just always are sad people.  Do you have certain good days and bad days with depression or is it just kind of a  - -

A        There are, occasionally, some good days where I'll feel halfway decent and, you know, be kind of happy.

Q        Well, let's say in a typical week, how many days would the depression become, if at all, overwhelming and very distracting?

A        Probably three to four out of the seven.

Q        And why don't you describe a day like that?

A        I'm sorry?

Q        Why don't you describe what a day like that looks like?

A       A day like that looks like?  It's one of those days where you just run, run and hide and not do anything.  Just lay down and give up.

Q       So, on those days, physically speaking, do you remain in the house?

A       Yes.

Q       And are you able to, to get things done around the house that need done?

A       No.

*          *          *

2.  Claimant

Testimony was taken at the hearing dated November 26, 2002 from Claimant, who testified as follows (Tr. 444–47):

ALJ: Now we took a fair amount of testimony the last time, so, we don't really need to, to go over those things again, except in so far as there's any change.  And now the main change seems to be this diagnosis that you've come down with of an esophageal cancer.

Q       And they - - when did, when did you find out about that?

A       I believe it was in June or July when, when I found out that I had the cancer.

Q       Okay.

A       And then they, they started in with the chemo and radiation treatments to try to reduce the tumor size.

Q       Um-hum.

A       And from there they decided to do the surgery to take the malignancy - - tumors, tumors out.  Which included removing two-thirds of my stomach and half the esophagus.

Q       Yeah, I saw that.  And that was done just last month or - -

23

A       Right, October the 3rd.

Q       So it's about a month and a half ago.  It looks like you recovered pretty well.

A       I'm doing fairly well, yes.

Q       The - - now are you still undergoing any chemo or radiation, or anything like that?

A       At the present time they are not doing any, any chemo and radiation.  I've got scheduled appointment, after the first of the year, to see the oncologist again so we can do the checkups to make sure that nothing is, is come back.  And, you know, it's an ongoing treatment process.

*          *          *

Q       What, what caused you to complain to the doctors that caused them to look in your esophagus?

A       I was having trouble eating and swallowing.

Q       Uh-huh.  How long was that going on?

A       That, that was going on for about a year.

Q       Okay.  And what kind of troubles did you have?

A       When I would try to swallow something, when I was eating, it's like it would get hung up in my esophagus and I would have to force it down with liquids, and then lots of times I couldn't even do that.  And I would actually vomit it back up.

*          *          *

A       I really didn't have a lot of side effects from the chemo and radiation.

Q       That's what I thought.

A       I came through that very well.  They were really surprised, you know.  I didn't really lost my hair and really didn't get sick from the chemo at all.

Q       Now - - and then did it, now, I don't see from the records here, but I - - because I don't have, I think I don't have all of the records from all of your doctors.  But did it shrink the tumors at all before you started - - before they did the surgery?  Do you know what - -

A       They, they said the tumors had shrank some.

Q       Um-hum.  Well, that's good.

A       That the chemo and radiation had, had shrank the tumors some.

Q       Yeah, that's good.  I know that's sort of the new way they treat, the newest way they treat cancer now rather than do surgery first, and then chemo.

A       Um-hum.

Q       They, they try to shrink it first and then do the surgery.  Okay, I - - is there any other change in your condition other than that?

A       It seems like, you know, with everything that's been going on with me, my depression has, has gotten a lot worse.

Q       Sure.  That's understandable, you know.  Are you - - have you been in the hospital for depression?

A       I haven't been in the hospital yet.  But, you know, I'm still seeing psychiatrists and psychologists.

### 3. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 435-38):

Q        Okay.  Let me give you a hypothetical question.  If we assume a person of the same age, education and work experience as the claimant.  But assume a person who is able to do light work as that's defined in the Commissioner's regulations.  But there'd be no more than occasional twisting of the spine.  No more than occasional bending and no bending more than 45 degrees at the waist.  And assume the person should be able to change positions briefly, at least every half hour for a brief period of, say, a minute or two.  The job should not involve detailed or complex instructions.  No close concentration or attention to detail for extended periods of time.  And the job should not involve fast pace, or assembly line work.  Would there be any jobs such a person could do at the light or sedentary levels?

A        I'll take the light first.

Q        Sure.

A        In that geographical area I believe that such a person with those limitations, in your hypothetical, could work as a security, unarmed security guard.  In that area there would be a minimum of 600 jobs, in the national economy there would be a minimum of 20 times that number.  Another possibility at the light level would be a gate guard, there would be a minimum of 300, nationwide, at least 20 times that number.  Another possibility would be a laundry inspector, be at least 100, nationwide, 20 times that.  At the sedentary level, such a person could work as a surveillance system monitor, in that area there would be at least 100, nationwide there'd be at least 20 times that.  Another possibility would be a dispatcher.  This could be in the business setting.

Q        Does this include emergency vehicles?

A        Yes.  There would be a minimum of at least two to 300, nationwide there'd be at

least 20 times that. Another possibility would be a self-service gas station attendant, there'd be a minimum of 250, nationwide, again, at least 20 times that number. Now these are representative, Your Honor, not all inclusive possibilities, that I believe conform to your hypothetical and limitations, could be performed.

Q        Would any of these involve more than occasional balancing, stooping, kneeling, crouching or crawling?

A        No.

Q        Would any of them involve climbing ladders, ropes or scaffolds?

A        No, they would not.

Q        Okay.

*            *            *

Q        If we were to assume that the claimant's testimony today with respect to his residual functional capacities, and I would think most notably just starting with the physical and the difficulty using his hands for certain grasping, I mean consistently. To grasp small objects and let's just say he would only be able to do that occasionally and might still drop things from time to time. And that he has to alternate pretty consistently during the day between standing and walking and sitting. And probably more importantly, yet, that the effects of depression, being low motivation and difficulty consistently performing at a pace and missing, at a competitive level, let's say, up to two, three times in a week on a regular basis. If that, those - - that testimony was found to be credible, based on the evidence, how would that effect his ability to perform substantial gainful activity, including the jobs, and types of jobs that you described in your earlier testimony?

A       I believe that [sic] rule out regular employment, counselor.  My rationale would be that the description that the claimant, and yourself, offered in your hypothetical of the depression and the pattern of the frequency of it, would not allow a person to be relied upon for five days, regular weekly basis to perform to the employer's satisfaction.

Q       And just sort of a general question along those lines.  If, for the record, a benchmark with respect to the number of days an employee could miss work on a chronic basis.  I mean, in other words, month in and month out, before it would become vocationally significant and would eliminate the possibility of performing jobs?

A       Generally the acceptable amount is one day a month.

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•       Smokes 2 ½ packs of cigarettes per day.  (Tr. 148).

•       Consumed 2 cases of beer per day for one year.  Consumed a lot of alcohol for two years.  Received a DUI during that time.  (Tr. 148, 157).

•       Smoked pot 3 times in his life.  (Tr. 148).

•       Claimant is obese.  At the height of 5' 8" weighed 260 lbs in 2000 (Tr. 165, 429).

•       Watches television, occasionally visits friends.  (Tr. 419, 422-23).

•       Dines at restaurants every now and then.  (Tr. 423).

•       Occasionally reads a book, sometimes shops with wife.  (Tr. 423).

•       Able to drive short distances.  (Tr. 423).

- Able to walk one to two blocks, able to stand for five to ten minutes. (Tr. 428).

- Able to sit for thirty to forty-five minutes at a time. After getting up can sit for another ten to twenty minutes. (Tr. 428-29).

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred by failing to give proper weight to the opinions of Claimant's treating psychiatrists and psychologist. Also, Claimant asserts that the ALJ failed to evaluate Claimant's credibility regarding his mental health.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly evaluated the opinions of Claimant's psychiatrists and psychologist. Also, Commissioner maintains that the ALJ properly evaluated Claimant's credibility.

B.    <u>The Standards</u>.

1.    <u>Summary Judgment</u>.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations

or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.     Judicial Review.   Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.     Social Security - Medically Determinable Impairment.   The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     Disability Prior to Expiration of Insured Status- Burden.   In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.     Social Security - Standard of Review.   It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.  Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must

address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.   Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.   To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.   Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.927(d)(2).  See also Evans v. Heckler, 734 F.2d 1012 (4th Cir.

1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990).

11. <u>Social Security - Claimant's Credibility</u>. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." <u>Shively v. Heckler</u>, 739 F.2d 987, 889 (4th Cir. 1984) citing <u>Tyler v. Weinberger</u>, 409 F. Supp. 776 (E.D. Va. 1976). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference. <u>See</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997). We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'" <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990).

C.     <u>Discussion</u>

### 1. Treating psychiatrists and psychologist

Claimant asserts that the ALJ erred by failing to give proper weight to the opinions of Claimant's treating psychiatrists and psychologist. Commissioner counters that the ALJ properly evaluated the opinions of Claimant's psychiatrists and psychologist.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). <u>See also</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990).

It appears that Claimant simply disagrees with the ALJ's analysis of Claimant's GAF scores.

Claimant agrees that the ALJ discussed Claimant's mental health at length, however, Claimant has a problem with the ALJ's statement "[t]he psychological and psychiatric GAFs are not consistently lowered; though they do appear at 48 and 50, they also appear twice, independently, at 60." Claimant asserts that the ALJ's statements are misleading for two reasons. The first being that "one of the higher GAF's reported in the record was reported in 1999, long before plaintiff's association with the Northwood clinic." (Pla. Brief p. 11). Claimant is correct one of the higher GAF scores (62) is from November 1, 1999. However, Claimant claims disability from August 1, 1999 so a GAF score from November 1, 1999 is certainly relevant even though it was not from the Northwood clinic. The second being that "the other GAF of 60 appeared in the context of four other reported GAF scores between December, 2000 and December, 2001 that were at 50 or below." (Pla. Brief p. 11). The differing GAF scores show inconsistency. Also, "none of the treating or examining medical or psychological experts expressly opined that the Claimant was incapable of any work." (Tr. 21). Dr. Bontos opined that Claimant was capable of sedentary work, and state agency medical experts opined that claimant was capable of medium exertional work and had no severe mental impairment. (Tr. 21).

Therefore, the opinions Claimant's treating psychiatrist and psychologist do not require controlling weight. The ALJ properly evaluated Claimant's GAF scores as reported by his psychiatrists and psychologist.

## 2. Credibility

Claimant asserts that the ALJ did not address Claimant's credibility in describing his mental health impairments. Commissioner counters that the ALJ did properly consider Claimant's credibility.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference. See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

The ALJ "did not find the claimant's testimony regarding the severity of his symptoms and the extent of his limitations fully credible". (Tr. 21). Claimant's symptoms and limitations include his mental health symptoms and the alleged limitations caused by the mental health symptoms. Also, Claimant alleged that he could only sit for ten minutes at a time, walk one to two blocks, stand for five to ten minutes, lift from five to ten pounds, averaged pain of five on a one-to-ten scale, dropped things, and had no desire to do anything. (Tr. 21). However, psychotherapy notes show that Claimant reported pain of 3.5-4 on a scale of one-to-ten, dramatic improvement with increased Neurontin and no side effects, and Claimant reported driving, visiting friends, reading, going to a restaurant and shopping with his wife. (Tr. 21). Therefore, the ALJ did properly analyze Claimant's credibility. In the alternative, the ALJ is in the best position to observe Claimant's demeanor during the hearing and evaluate his credibility. The Claimant did not show that the ALJ's credibility determination was patently wrong. Therefore, the ALJ properly analyzed Claimant's credibility.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED because the ALJ properly evaluated the opinions of Claimant's psychiatrists and psychologist and properly evaluated Claimant's credibility.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: April 25, 2005

<u>/s/ James E. Seibert</u>

JAMES E.  SEIBERT
UNITED STATES MAGISTRATE JUDGE